

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00004-CR

_____

EX PARTE MICHAEL LORENCE

---

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F-2013-0530-D

---

Before Gabriel, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an interlocutory appeal and cross-appeal from the denial of relief on a pretrial application for writ of habeas corpus and from rulings on proposed evidentiary exclusions. When the State moved forward with attempting to try Appellant Michael Lorence for conspiracy to commit capital murder, he filed a pretrial application for writ of habeas corpus based on a jury's not-guilty verdict in his 2019 trial for the offense of aggravated assault with a deadly weapon.[1] Appellant sought to have the indictment for the conspiracy charge dismissed on double-jeopardy grounds based on the doctrine of collateral estoppel/issue preclusion.[2] The trial court denied Appellant's application but stated that there was evidence from the aggravated assault trial that needed to be excluded because it would violate collateral estoppel with regard to going forward in

---

[1]Appellant was initially tried and found guilty of the offense of aggravated assault with a deadly weapon in 2015, but on appeal, this court reversed his conviction. *See Lorence v. State*, No. 02-15-00398-CR, 2017 WL 4172077, at \*16, \*18 (Tex. App.—Fort Worth Sept. 21, 2017, pet. ref'd) (mem. op. on reh'g, not designated for publication). Appellant's trial on remand, which was held in January 2019, resulted in the acquittal that is the basis of the double-jeopardy claim that he raises in his pretrial application for writ of habeas corpus in his conspiracy case.

[2]As pointed out by both Appellant and the State, cases traditionally refer to this doctrine as "collateral estoppel," but the United States Supreme Court has noted that "issue preclusion" is the more descriptive term. *See Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356 n.1 (2016) (citing *Yeager v. United States*, 557 U.S. 110, 119 n.4, 129 S. Ct. 2360, 2367 n.4 (2009), and Restatement (Second) of Judgments § 27, cmt. b, pp. 251–252 (Am. Law Inst. 1980)).

the conspiracy case. The trial court asked the parties to review the record from the prior aggravated assault trials to determine which matters from those trials could not be presented to or argued in front of the jury in the conspiracy trial. The trial court adopted the evidentiary exclusions that were agreed to by the parties and granted other evidentiary exclusions that Appellant had proposed.

In a single issue, Appellant argues that the trial court erred by denying his application. Specifically, Appellant argues that the issue preclusion component of the Double Jeopardy Clause "*completely* bars the State's current prosecution of Appellant for conspiracy to commit capital murder where a jury has previously acquitted Appellant of the object of the conspiracy – aggravated assault with a deadly weapon – both as the primary actor[] and as a party to the offense." After reviewing the entire record of the 2019 trial and taking into account the pleadings, the evidence, and the charge, we conclude that a rational jury did not necessarily decide whether Appellant "encouraged, directed, aided[,] or attempted to aid Michael Speck in committing the offense of Aggravated Assault, to wit: by helping plan the shooting of Nancy Howard." Accordingly, we affirm the portion of the trial court's order denying relief on Appellant's pretrial application for writ of habeas corpus.

The State argues in its cross-appeal that because the only issue that the jury decided against the State in Appellant's 2019 retrial dealt with the identity of the shooter, the trial court abused its discretion when it suppressed evidence that went beyond that issue. Because we must view the evidence in the light most favorable to

3

the trial court's ruling and because we are required to defer almost totally to the trial court's rulings on application-of-law-to-fact questions that turn on evaluating credibility and demeanor, we hold that the trial court did not abuse its discretion by ruling that the complained-of testimony should be excluded from the conspiracy trial. We therefore affirm the remainder of the trial court's order that includes the evidentiary exclusions challenged by the State.

## II. Background Facts

### A. Overview

The victim, Nancy Howard,[3] called 911 after she was shot above her left eyebrow while in her garage in Carrollton on August 18, 2012. The police investigation revealed that John Franklin Howard, who was Nancy's husband at that time, had hired a man in East Texas named Billie Johnson to kill Nancy.[4] The investigation further revealed that before Billie could carry out the murder-for-hire plan, he was arrested on drug charges. Billie's arrest, however, did not stop John from proceeding with the murder-for-hire plan. Instead, Billie's nephew Michael Alan Speck Jr. took over Billie's role.

---

[3]At the time of the 2019 trial, she went by the name Nancy Shore.

[4]Because, unlike in Appellant's prior appeal, the sufficiency of the evidence is not at issue in these appeals, we do not attempt to delve into the lengthy history of the many individuals that John and others brought into his scheme to have Nancy murdered. *See Lorence*, 2017 WL 4172077, at *1, *4 (setting forth a diagram of the individuals who received payments from John as part of the murder-for-hire scheme). Instead, we include only a brief factual background that provides the context for the issues in these appeals.

4

### B.    Speck's Testimony

Speck testified at Appellant's trial and gave his rendition of the events.[5]  Speck testified that a few weeks after Billie was arrested, Speck met with John at a Whataburger in Grapevine and said that he would take over Billie's role and complete the job.  John gave Speck "a couple thousand" dollars and a picture of Nancy and her car.  John said that he would text Speck information about where to find Nancy and that it would most likely be at church.  Speck got his cousin Dustin Hiroms (who considered Billie his stepdad) involved to purchase the gun and to be the driver.

A few weeks later, on June 18, 2012, Speck met with John at a closed-down restaurant near a La Quinta in Farmers Branch.  After the meeting near the La Quinta, Speck returned to East Texas on June 19, lost contact with John, and no longer wanted to have any involvement with him.  Speck explained that at that time, he no longer planned on carrying out the plot to kill Nancy because there were "too many people involved in it" and because "[i]t was just too risky."  Speck also had a falling out with Dustin.  Speck was asked, "After you got back to East Texas from this La Quinta meeting, did you want to involve Dustin anymore in the murder-for-hire plot to kill

---

[5]Around the time that the State was scheduled to go to trial on the aggravated assault charges pending against Speck for his involvement in Nancy's injuries, he told police for the first time that Appellant had been the trigger man.  Speck accepted a plea bargain for a twelve-year sentence in exchange for his testimony against Appellant; Speck agreed that he had received the "deal of [the] century."

Nancy Howard?" Speck replied, "No," and explained that he was "going to be done with it" and wanted Dustin to be done with it.

Speck said that approximately two weeks before the shooting, he reconnected and met with John at the Whataburger in Grapevine. John gave Speck $5,000, agreed to pay $150,000 after the shooting, and said that he would text Speck information about when Nancy would be at church.

Speck then testified about his connection to Appellant. Speck said that he and Appellant had become friends when Speck had lived in California and that Appellant had reconnected with him on Facebook. Speck invited Appellant to come visit him in Texas and asked him to bring his (Speck's) brother Virgil Rodriguez, who also lived in California, with him. To cover the cost of the gas, food, and lodging for the road trip, on August 14, 2012, Speck wired $1,000 to Appellant's fiancée at the time, Misti Ford. Speck testified that Appellant, Misti, and Virgil arrived in Texas a few days later in Misti's vehicle.

After Appellant arrived in Texas, Speck talked to him alone outside Speck's home in Grand Saline and allegedly told him about the murder-for-hire plot. Speck explained his plan: he would be the shooter, and Appellant would be the driver. Speck testified that Appellant suggested that they reverse those roles because Speck had a young son. After that conversation, Speck, Speck's son, the mother of Speck's son (Kayla), Appellant, and Misti went to Tyler and rented a Nissan Altima because Misti's car had a tire issue.

6

The following day, on August 17, 2012, Speck drove Appellant in the Nissan to Carrollton; they drove by Nancy's house and the church so that Speck could show Appellant "where it was going to take place." They returned to Grand Saline that evening.

On August 18, 2012, Speck and Appellant drove back to Carrollton. They went to a Ross store to buy hoodies, caps, and gloves. Speck testified that they changed into the clothes they had bought, went to Chili's for alcoholic beverages, and then drove to Nancy's house.

While on the way to Nancy's house, they saw her driving and began following her. They parked and waited while Nancy was at church. Speck went inside the church to use the restroom. After Speck had used the restroom, they drove back to Chili's for more drinks. Speck testified that he knew that Nancy would be done at church at 7 p.m., so they returned to the church parking lot and waited.

After Nancy returned to her car and drove out of the parking lot, the men followed her. When she went through the drive-through at Taco Bueno, the men parked and then left before her to beat her to her house. They went to the alley behind her house, and Appellant got out of the car. Speck said that Appellant took the gun that was in the glove box, and Speck drove down the alley and parked around the corner. Speck heard one gunshot and drove back down the alley to pick up Appellant.

Speck testified that when he picked up Appellant, Appellant had a purse with him. Speck said that they stopped at a business a few blocks away, and Appellant

disposed of the purse in a dumpster. Before returning to Grand Saline, they stopped at Lake Tawakoni to dispose of the gun and their clothes. They arrived at Speck's home in Grand Saline around 10 p.m., and Speck told Kayla that "it was finished."

On cross-examination, Speck admitted that after he was in jail, he had gotten two large tattoos on his hands and across his knuckles to change his appearance.

### C.    Misti's Testimony

Misti, who described Appellant as her ex-fiancé, testified that she and Appellant came to Texas in August 2012 so that he could introduce her to an old friend of his (Speck), whom he wanted to be his best man in their wedding. When Misti woke up on August 18, Speck and Appellant were not at the house, and neither was the Nissan Altima. Misti's understanding from the night before was that Speck and Appellant were planning to head to Dallas the following day (August 18) to check out a few side jobs.

Misti testified that when Speck and Appellant returned to Speck's home in Grand Saline on the night of August 18, Appellant "was acting different." Misti explained that Appellant was very quiet and was drinking alcohol and that he was usually not quiet and did not drink alcohol. Misti testified that she was concerned about Appellant and asked him what was bothering him; Misti said, "He told me that he shot somebody." Misti testified that she started crying and that Appellant gave her details even though she did not ask for them:

> He told me that him and Michael Speck went to kill some lady and that
> he followed her home, went in her garage. When she got out of her car,

8

he shot her in the face, stole her purse and her groceries to make it look like a burglary gone wrong, and then they left.

Misti said that Appellant cried as he told her about the events. Misti testified that she did not call the police because she was afraid of getting in trouble.

That night, Misti and Appellant stayed in a hotel because it was more comfortable than sleeping on the floor at Kayla and Speck's one-bedroom home. The following day, they went to Tyler to return the Nissan Altima, ate lunch in Tyler with Kayla and Speck, and then drove back to California. They did not talk about the event during the drive.

Misti testified that after they returned to California, she continued living with Appellant. She said that they did not have an extra $75,000 or $5,000 or even $500 to spend and that they did not make any major purchases. Misti testified that she and Kayla continued to talk after Misti was back in California; although Misti initially said that Kayla did not give her updates, she admitted that Kayla had called and had told her that Speck had been arrested and that it was a murder-for-hire deal.

During the two months after their trip to Texas but before Misti ended her relationship with Appellant, they talked about the event a couple of times. Misti said that Appellant felt bad that he had shot a woman. Misti testified that she had asked him why he was the shooter and that Appellant had said that "he didn't want Michael Speck to do it because he had a new family."

When the lead investigator (Investigator Michael Wall) contacted Misti, she gave two statements. In Misti's first statement, she did not mention that either she or Appellant were involved in the shooting; she claimed that they had learned about the shooting after the fact. After the police told Misti that they had information that led them to believe that she knew more about the shooting and that they needed to either move forward with charging her as an accomplice for criminal solicitation of capital murder or with using her as a witness, the whole tenor changed. Misti asked what would happen to her kids, and the police said that they needed "the conclusion." Misti agreed that the police had made it clear to her, based on what they were saying and how they were saying it, that they wanted her to tell them that Appellant was the shooter. Misti then gave a statement that Appellant was the shooter. Misti admitted that it was in her best interest to cooperate with the police so that they would not act on the warrant for her arrest, which would have taken her away from her kids.

After Appellant was in jail, Misti talked to him on the phone, and he said that "he wasn't there" and that "he didn't do anything."

### D. Testimony from Appellant's Alleged Pod Mate

Grady Vollintine testified that he was in Denton County Jail and that during his confinement, he had been in the same pod as Appellant for a couple of months. Grady met with law enforcement in 2014 because "No Good," which he claimed was

10

Appellant's nickname, had told him some things.[6] Grady testified that Appellant had talked to him when they were alone in the rec yard and had told him that he had

> messed up and how he [had] messed up. He wasn't acting right. He drank or took some pills or something. Anyway, he had got high, and his wife or his fiancee, I'm not sure which one, had noticed he was acting weird, acting funny, and confronted him. And whenever he was confronted, he actually told her what had happened.

> And he told me something about that she knew some item -- she knew something that wasn't released like in the press or in public, that she knew of an item. I don't know what that item was. But he told me that she knew something, so they really took what she said real serious.

> . . . .

> . . . He said, "*I shot that b[---]h.*" [Emphasis added.]

Grady admitted that any time Appellant was around other people, he was adamant that he did not shoot Nancy, that he had done nothing wrong, and that he was not guilty.

**E.    Virgil**

Virgil, Speck's brother, testified that Speck had called him in August 2012 and had asked if he wanted to take a road trip to Texas with Appellant to visit Speck. Prior to the road trip, Virgil did not know Appellant or Misti.

Virgil testified that while they were in Grand Saline staying at Speck's home, Speck and Appellant had left a couple of times. Virgil asked to go along on the first

---

[6]Grady met with Investigator Wall approximately three weeks before his federal conspiracy trial.

outing, but Speck told him no.  Virgil did not attempt to go along the second time that Speck and Appellant left.  Virgil did not know where they went.

### F.    Dustin

Dustin, Speck's cousin, testified that he was aware that his mom (Stacey) and Billie were getting money from John and knew "what they were being paid for."  Dustin admitted that he was involved with Speck in the plan to kill Nancy.  Although Dustin, using money that Speck had given him, had bought a .380 off the street so that it could not be traced, his main role was to be the driver for Speck.

Dustin went to Carrollton and met with John for the first time on July 4, 2012. They "discussed a plan for Nancy Howard, and [John] told [Dustin] this is the way he wanted it done, away from the house.  He wanted it to look like a robbery."  Dustin then returned to East Texas.

On August 4, John visited Dustin and brought him money.

On August 9, Dustin met with John in Mesquite.  After that visit, Dustin attempted to contact John again, but John never responded.  Dustin testified that he and Speck had a falling out and that he did not drive Speck to Nancy's house on the day of the offense.

On cross-examination, Dustin admitted that he had previously given a statement saying that he could not recall where he was on August 18 (the day of the shooting). Dustin agreed (1) that he had told the police that if he was going to do the shooting, it would have to be done at the house; (2) that the plan was to go up to Nancy, rob her,

12

take her purse, dump her purse, and then go on living his life; and (3) that he had shell casings all around when the police arrested him just days after the shooting. Dustin said that he did not know Appellant; had never met him, seen him, or talked to him; had not given him money; and did not know him from Adam.

### G. Investigator Wall's Testimony

Investigator Wall agreed that there was zero record of Appellant's having any contact with anyone except Speck. Investigator Wall testified that he believed that Speck "was untruthful during all of [their] interviews." Speck lied about how much money he had received; Speck had never told Investigator Wall about the $150,000 (the money that John promised to pay after Nancy had been murdered) that Speck testified to during the trial. Speck also lied to Investigator Wall about his involvement with John.

Investigator Wall agreed that John's phone records show no connection to Appellant. Investigator Wall also agreed that the forensic analysis of John's computers and an analysis of John's financial records showed no connection to Appellant.

Investigator Wall further agreed that the only money that Appellant had any connection to was the $1,000 that Speck had wired to Misti. Investigator Wall testified that to his knowledge, Appellant was the only one "who didn't get obscene amounts of money for this" and that there "was a big-time money trail in this case from John Howard to everybody else."

13

Investigator Wall agreed that he had no physical evidence connecting Appellant to the shooting on August 18, 2012. Investigator Wall also agreed that Appellant was excluded as a contributor to the DNA that was found on Nancy's purse.

### III. Findings of Fact and Conclusions of Law[7]

In conjunction with ruling on Appellant's pretrial application for writ of habeas corpus, the trial court ultimately issued the following findings of fact and conclusions of law:

> On June 21, 2019, August 23, 2019, and September 27, 2019, the Court heard . . . [Appellant's] Writ of Habeas Corpus. After considering all the pleadings, evidence, and argument, the Court made the following Findings of Fact and Conclusions of Law.
>
> To the extent that any findings of fact below are construed to be conclusions of law, they are expressly adopted as conclusions of law. To the extent that any of the conclusions of law below are construed as findings of fact, they are expressly adopted as findings of fact.
>
> *Findings of Fact*
>
> 1. On March 25, 2013, the State indicted [Appellant] in F-2013-0530-D for Conspiracy to Commit Capital Murder.
>
> 2. On March 25, 2013, the State indicted [Appellant] in F-2013-0531-D for Aggravated Robbery.
>
> 3. On October 24, 2014, the [S]tate indicted [Appellant] in F-2014-2002-D for Aggravated Assault with a Deadly Weapon.
>
> 4. The State proceeded to try [Appellant] in F-2014-2002-D for Aggravated Assault with a Deadly Weapon.

---

[7]In lieu of a procedural background, which is briefly summarized in footnote 1 above, we set forth the trial court's findings of facts and conclusions of law.

5.  A jury found [Appellant] guilty of Aggravated Assault in F-2014-2002-D. However, the Second Court of Appeals reversed and remanded for a new trial.

6.  On January 23, 2019, on retrial, [Appellant] was found not guilty of Aggravated Assault with a Deadly Weapon in F-2014-2002-D.

7.  On January 29, 2019, the Aggravated Robbery case in F-2013-0531-D was dismissed.

8.  In F-2014-2002-D, the Aggravated Assault with a Deadly Weapon retrial, the State requested an instruction pursuant to the law of parties to be included in the jury charge.

9.  The State drafted the proposed jury charge on the law of parties that was submitted to the Court and ultimately contained in the jury charge.

10. Nancy Howard testified that one man shot her. The evidence showed that there was just one gun involved.

11. The key evidence that [Appellant] was the shooter came from the testimony of three witnesses: (1) Michael Speck; (2) Misti Ford; and (3) Grady Voll[i]ntine.

12. The clearly contested issues in this trial were (1) whether [Appellant had] shot Nancy Howard and (2) whether or not [he] was a party to the Aggravated Assault of Nancy Howard.

13. The jury charge allowed the jury to find [Appellant] guilty if (1) the jury found that [he] intentionally or knowingly caused bodily injury to Nancy Howard by shooting her with a firearm, or (2) the jury found that the law of parties applied.

14. The law[-]of[-]parties charge submitted stated that the jury [could] find [Appellant] guilty only if it found that (1) [he] encouraged, directed, aided[,] or attempted to aid Michael Speck in committing the offense of Aggravated Assault by helping plan the shooting of Nancy Howard, and (2) Speck intentionally or knowingly caused bodily injury to Nancy Howard by shooting Nancy Howard with a

15

firearm, and (3) during the commission of said assault, [Appellant] used or exhibited a deadly weapon, a firearm.

15. Other evidence connected [Appellant] to the murder plot that did not specifically indicate that [he] was the shooter.

16. Speck and [Appellant] rented a Nissan under [Appellant's] girlfriend's name[,] and that car was the car in Carrollton at the time of the assault.

17. Virgil Rodriguez, not listed as an accomplice in the jury charge, testified that Speck and [Appellant] left Grand Saline together and [that they] did not allow him to go with them.

18. Michael Wall testified that the church surveillance footage showed two people in the Nissan at the church.

## Conclusions of Law

1. Aggravated Assault and Conspiracy to Commit Capital Murder "are separate offenses for double jeopardy purposes," so this offense is not barred by the [D]ouble [J]eopardy [C]lause. *See United States v. Felix*, 503 U.S. 378, 390–92 (1992); *see also Ex parte Chaddock*, 369 S.W.3d 880, 889 (Tex. Crim. App. 2012) (Cochran, J., concurring); *Ex parte Brosky*, 863 S.W.2d 783 (Tex. App.—Fort Worth 1993, no pet.).

2. It is clear that Aggravated Assault and Criminal Conspiracy are distinct statu[t]es, each of which requires proof of different elements, so a "same elements" test is inapplicable. *See Blockburger v. U.S.*, 284 U.S. 299, 304 (1932). Likewise, one offense is not a lesser-included offense of the other under a cognate-pleadings approach. *See Hall v. State*, 225 S.W.3d 524 (Tex. Crim. App. 2007) (reh'[g] denied).

3. The jury had a reasonable doubt that [Appellant] was the shooter.

4. Since the jury found [Appellant] not guilty, the jury either did not believe that portion of the testimony of Michael Speck, Misti Ford, and Grady Voll[i]ntine, or the jury did not find that that portion of

16

the testimony was sufficiently corroborated by non-accomplice witness testimony.

5. A rational jury could have disbelieved Speck's testimony about who shot the victim if the jury thought that [he] was shifting the blame to get a better plea-bargain agreement.

6. A rational jury could have disbelieved Ford's and Vollintine's testimony about [Appellant's] admissions because the jury thought that the accomplices were trying to protect or benefit themselves.

7. The jury could only have found [Appellant] guilty as a party if the jury found that [he] used or exhibited a firearm during the assault.

8. A rational jury could have grounded its verdict upon finding that [Appellant] did not use or exhibit a deadly weapon. Therefore, the jury did not necessarily find that [he] did not encourage, direct, aid, or attempt to aid Michael Speck by helping him plan the shooting of Nancy Howard. *See Ashe v. Swenson*, 397 U.S. 436, 444[, 90 S. Ct. 1189, 1194] (1970).

9. However, a rational jury could have doubted whether [Appellant] was the shooter and still found that [Appellant] agreed with Speck and others that "they or one of them" would murder Nancy Howard for money and that he or one or more of them performed overt acts in pursuance of that agreement because[] (1) more evidence corroborated [Appellant's] involvement in the plot than specifically corroborated his role as the shooter, and (2) the jury could have thought that Speck was lying specifically about who the shooter was in order to benefit himself. *See* [*id.*, 90 S. Ct. at 1194].

10. The State is precluded from relitigating whether [Appellant] was the shooter and caused bodily injury to Nancy Howard by shooting her with a firearm. The Court has reviewed the record of the previous trials and [has] made specific rulings as to which evidence the State is precluded from presenting.[8]

---

[8]Those rulings are set forth and discussed below in part V. of the opinion, which addresses the State's appeal.

17

11.   Whether [Appellant] shot Nancy Howard is not an essential element of the Conspiracy to Commit Capital Murder charge against [him].

12.   Therefore, proceeding with the Conspiracy to Commit Capital Murder charge against [Appellant] is not a violation of Double Jeopardy or Collateral Estoppel since no evidence of [his] being the shooter will be allowed in the trial of the Conspiracy charge.

For the above reasons, [Appellant's] Writ of Habeas Corpus is hereby DENIED.

## IV.  Appellant's Appeal

In the sole issue in Appellant's appeal, he argues that the trial court erred by denying relief on his application because the issue preclusion component of the Double Jeopardy Clause "*completely* bars the State's current prosecution of Appellant for conspiracy to commit capital murder where a jury has previously acquitted Appellant of the object of the conspiracy – aggravated assault with a deadly weapon – both as the primary actor[] and as a party to the offense." We first set forth the standard of review and the relevant law before applying that law to determine whether collateral estoppel bars Appellant's prosecution for conspiracy.

### A.   Standard of Review

We review the trial court's ruling on a pretrial writ of habeas corpus for an abuse of discretion. *Ex parte Paxton*, 493 S.W.3d 292, 297 (Tex. App.—Dallas 2016, pet. ref'd). We view the evidence in the light most favorable to the trial court's ruling and uphold it absent an abuse of discretion. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). We defer to the trial court's findings of fact supported by the record, especially

18

when the fact findings arise from evaluating credibility and demeanor. *Paxton*, 493 S.W.3d at 297. We also defer to the trial court's application of the law to the facts if resolving the ultimate question turns on an evaluation of credibility and demeanor. *Id.* If resolving the ultimate question turns on applying legal standards, we review the trial court's determination de novo. *Id.* "A decision to apply collateral estoppel is a question of law, applied to the facts, for which de novo review is appropriate." *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007).

**B.      The Law**

In a recent opinion, the Texas Court of Criminal Appeals set forth the relationship between double jeopardy and collateral estoppel:

> The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, [2076] (1969); *Aekins v. State*, 447 S.W.3d 270, 274 (Tex. Crim. App. 2014).
>
> In *Ashe v. Swenson*, the Supreme Court recognized that the Fifth Amendment guarantee against double jeopardy also embodies the principle of collateral estoppel as a constitutional requirement. . . . 397 U.S. [at] 445, 90 S. Ct. [at 1195] . . . .
>
> . . . Collateral estoppel "stands for an extremely important principle[:] . . . when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S. Ct. [at 1194].
>
> Thus, as we explained in *Rollerson*:

> [U]nder the collateral-estoppel component of double
> jeopardy, the government may not litigate a specific
> elemental fact to a competent factfinder (judge or jury),
> receive an adverse finding by that factfinder on the specific
> fact, learn from its mistakes, hone its prosecutorial
> performance, and relitigate that same factual element that
> the original factfinder had already decided against the
> government.
>
> *Rollerson v. State*, 227 S.W.3d 718, 730 (Tex. Crim. App. 2007); *Ashe*,
> 397 U.S. at 447, 90 S. Ct. [at 1196] ("'No doubt the prosecutor felt the
> state had a provable case on the first charge and, when he lost, he did what
> every good attorney would do—he refined his presentation in light of the
> turn of events at the first trial.' But this is precisely what the constitutional
> guarantee forbids.").
>
> Therefore[,]
>
> > [i]n applying the doctrine of collateral estoppel, courts must
> > first determine whether the jury determined a specific fact,
> > and if so, how broad—in terms of time, space[,] and
> > content—was the scope of its finding. *Before collateral estoppel*
> > *will apply to bar relitigation of a discrete fact, that fact must necessarily*
> > *have been decided in favor of the defendant in the first trial.*
>
> *Ex parte Watkins*, 73 S.W.3d 264, 268 (Tex. Crim. App. 2002) (emphasis
> added); *see also Rollerson*, 227 S.W.3d at 731 (emphasizing same).

*Ex parte Adams*, 586 S.W.3d 1, 4–5 (Tex. Crim. App. 2019).

In a prior opinion, the Texas Court of Criminal Appeals set forth a more detailed

explanation, including the steps for analyzing a collateral estoppel issue and the

application of those steps:

> The scope of facts that were actually litigated determines the scope of the
> factual finding covered by collateral estoppel. *Guajardo*[ *v. State*], 109
> S.W.3d [456,] 460 [(Tex. Crim. App. 2003)]; [*Ex parte*] *Taylor*, 101 S.W.3d
> [434,] 442 [(Tex. Crim. App. 2002)]. The very fact or point at issue in the
> pending case must have been determined in the prior proceeding. *Taylor*,

20

101 S.W.3d at 441. The defendant must meet the burden of proving that the facts in issue were necessarily decided in the prior proceeding. *Guajardo*, 109 S.W.3d at 460.

To determine whether collateral estoppel bars a subsequent prosecution or permits the prosecution but bars relitigation of certain specific facts, this court *has* adopted the two-step analysis employed by the Fifth Circuit. *See Neal v. Cain*, 141 F.3d 207, 210 (5th Cir. 1998); *see also Taylor*, 101 S.W.3d at 440. This court stated that a court must determine (1) exactly what facts were necessarily decided in the first proceeding, and (2) whether those "necessarily decided" facts constitute essential elements of the offense in the second trial. *Taylor*, 101 S.W.3d at 440.

The first prong is fairly simple; the particular fact litigated in the first prosecution, in which a final judgment was entered, must be the exact fact at issue in the second prosecution. . . .

In applying the doctrine of collateral estoppel, its limitations must be kept in mind. Although collateral estoppel requires that the precise fact litigated in the first prosecution have arisen in the same transaction, occurrence, situation, or criminal episode that gave rise to the second prosecution, the fact litigated must also be an essential element of the subsequent offense. [*Id.*]; *Neal*, 141 F.3d at 210. Specifically, if the necessarily decided fact litigated in the first prosecution constitutes an essential element framed within the second prosecution's offense, then the "essential element of the offense" prong is satisfied. *See Taylor*, 101 S.W.3d at 440.

*Murphy v. State*, 239 S.W.3d 791, 795 (Tex. Crim. App. 2007) (footnote omitted).

However, the Supreme Court emphasized in *Ashe* that

the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book[] but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed

21

with an eye to all the circumstances of the proceedings." *Sealfon v. United States*, 332 U.S. 575, 579, 68 S. Ct. 237, 240[ (1948)]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.[9]

397 U.S. at 444, 90 S. Ct. at 1194 (footnotes omitted).

## C. Analysis

### 1. What issues were necessarily decided in the aggravated assault trial

Appellant contends that throughout the trial the contested issue was not just whether he had shot Nancy but also "*whether he even knew of, or was involved at all in*, the existence of any conspiracy or plan to kill [her], versus whether he was just an unknowing stooge of Speck." Appellant argues that the jury's "not guilty" verdict means that the jury necessarily and explicitly decided that (1) Appellant did not shoot Nancy on or about August 18, 2012, and (2) Appellant did not act with the intent to promote or assist the commission of the offense by encouraging, directing, aiding, or attempting to aid Speck or the listed accomplices in committing the offense of aggravated assault by helping plan her shooting. After reviewing the 2019 trial record, the arguments, and the jury charge, we disagree with Appellant's second conclusion. As explained in the following analysis, the conjunctive wording of the charge on the law of

---

[9]"A general verdict returned in the guilt phase of a criminal trial frequently makes it difficult to determine precisely which historical facts a jury found to support an acquittal." *Watkins*, 73 S.W.3d at 269. "This task is considerably less difficult[, however,] when a jury is given special fact issues to determine." *Id.*

parties allowed the jury to find Appellant "not guilty" if any one of the three listed acts was not proven beyond a reasonable doubt, and one of the listed acts was whether Appellant had used or had exhibited a deadly weapon in the form of a firearm. Further, the evidence and arguments presented at trial were not such that the jury's acquittal of Appellant means that it necessarily decided that Appellant had not helped plan the shooting.

As directed by the *Adams* opinion, we begin with the jury charge, as it is "the natural place to begin" when "determining which facts were necessarily determined by the jury" because it "told the jury the particular circumstances under which it was to return a 'Not Guilty' verdict." *See* 586 S.W.3d at 6. The jury charge from the aggravated assault trial, which was admitted into evidence at the pretrial habeas hearing in the conspiracy case, included a law-of-parties instruction:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with the commission of the offense.
>
> Mere presence alone will not make a person a party to an offense. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

That instruction was followed by two charging paragraphs under which the jury could find Appellant guilty of aggravated assault:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 18th day of August, 2012, in Denton County, Texas[,] the

23

defendant, MICHAEL LORENCE, did then and there intentionally or knowingly cause bodily injury to Nancy Howard by shooting Nancy Howard with a firearm, and the defendant did then [and] there, during the commission of said Assault, use or exhibit a deadly weapon, to wit: a firearm as alleged in the indictment, you will find the defendant guilty of Aggravated Assault, as charged in the indictment; or

If you believe from the evidence beyond a reasonable doubt that the defendant, MICHAEL LORENCE, did then and there, acting with intent to promote or assist the commission of the offense, either encouraged, directed, aided[,] or attempted to aid Michael Speck in committing the offense of Aggravated Assault, to wit: by helping plan the shooting of Nancy Howard, and Michael Speck, on or about the 18th day of August, 2012, in Denton County, Texas, did then and there intentionally or knowingly cause bodily injury to Nancy Howard by shooting Nancy Howard with a firearm, and *the defendant* did then and there, during the commission of said assault, use or exhibit a deadly weapon, to-wit: a firearm, then you will find MICHAEL LORENCE, guilty of Aggravated Assault, as charged in the indictment.

If you do not so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty. [Emphasis added.]

The charge also contained the following instructions regarding the corroboration

that is necessary for certain testimony:

Upon the law of accomplice witness testimony, you are instructed that Billie Johnson, John Howard, Stacey Serenko, Michael Speck, Kayla Christman, Dustin Hiroms, and [Misti] Ford, were accomplices, if any offense was committed, as alleged in the indictment. With this in mind, you are further instructed that you cannot convict the defendant upon the testimony of Billie Johnson, John Howard, Stacey Serenko, Michael Speck, Kayla Christman, Dustin Hiroms, or [Misti] Ford alone, unless you first believe that the testimony is true and shows the guilt of the defendant as charged in the indictment, and then you cannot convict the defendant unless the testimony of Billie Johnson, John Howard, Stacey Serenko, Michael Speck, Kayla Christman, Dustin Hiroms, or [Misti] Ford is corroborated by other evidence tending to connect the defendant with the offense charged. The corroboration is not sufficient if it merely shows the commission of the offense. The corroboration must tend to connect

24

the defendant with the commission of the offense. Then, from all the evidence, you must believe beyond a reasonable doubt that the defendant is guilty of the offense charged against him.

Testimony of another accomplice is not sufficient to corroborate the testimony of an accomplice. The corroborative evidence, in other words, must be from some source other than accomplices. Proof that the defendant was merely present in the company of the accomplice shortly before or after the time of any offense that was committed is not, in itself, sufficient corroboration of the accomplice's testimony. That evidence, however, can be considered along with other suspicious circumstances.

A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed. Corroboration is not sufficient if the corroboration only shows that the offense was committed.

The law-of-parties instruction and the paragraph charging Appellant with aggravated assault as a party (the law-of-parties charge) form the crux of Appellant's appeal.

According to the paragraph that charged Appellant with aggravated assault as the shooter, the jury was instructed to return a "not guilty" verdict if the jury found that the State did not prove beyond a reasonable doubt that Appellant was the principal actor who shot Nancy and used or exhibited a firearm while doing so. According to the paragraph that charged Appellant with aggravated assault as a party, the jury was required to return a "not guilty" verdict if the jury found that the State did not prove beyond a reasonable doubt the following three acts:

(1) Appellant helped Speck plan the shooting of Nancy Howard, *and*

25

(2) Speck shot Nancy with a firearm, *and*

(3) Appellant used or exhibited a firearm during the offense.

The parties agree that the jury's "not guilty" verdict means that they found that Appellant was not the shooter under the paragraph charging him as a principal and that they moved on to the paragraph charging him as a party. As to the law-of-parties charge, Appellant and the State part ways regarding their interpretations of the jury's "not guilty" verdict. Appellant contends that the jury necessarily found that he was not a party to the offense. The State, however, contends that the compound nature of the law-of-parties charge "prevents us from discovering what the jury actually decided about the first section of the parties charge."[10]

We must ask whether the fact that Appellant was not the shooter in combination with the charge, argument, and other evidence prompts the conclusion that the jury also necessarily decided that Appellant did not aid or assist Speck in committing the offense. Our analysis turns on the conjunctive wording in the law-of-parties charge, which required the jury to make three affirmative findings before it could find Appellant guilty as a party. Our particular focus is on part (3) of the law-of-parties charge; it repeats the deadly-weapon language from the latter portion of the paragraph charging Appellant as the shooter—stating that "the defendant" (instead of Speck) used or exhibited a

---

[10]It is unclear why the instruction has the italicized reference to "the defendant." Appellant claims that the reference was a "syntactical error" and should have instead been a reference to Michael Speck. No matter its origin, the instruction includes the term.

26

firearm. Although the parties agree that the jury found that Appellant was not the shooter, we must determine whether there is evidence of two guns possessed by separate individuals. Under a two-gun theory, Appellant would not have been the shooter but could have aided Speck by brandishing a gun while Speck committed the aggravated assault against Nancy. We therefore review the record to determine whether the jury necessarily found that Appellant did not use or exhibit a firearm (i.e., evidence was presented showing that only one person—-the shooter—exhibited a firearm). After this analysis, we agree with the State that

> [t]hough the jury charge included a law[-]of[-]parties instruction, the compound nature of that instruction, in light of the nature of the evidence and the defensive strategy, prevents us from discovering what the jury actually decided about whether [Appellant] encouraged, directed, aided[,] or attempted to aid Speck in committing the offense. A rational jury still could have found that [Appellant] was involved in the agreement to kill Nancy Howard even though it did not find that he was the shooter because it could have disbelieved—or found not sufficiently corroborated—the specific evidence that pointed to [Appellant] as the shooter.

At trial, Speck testified about only one gun—its purchase, its placement in the glove box, its alleged use by Appellant, and its disposal in the lake. There is no testimony about a second gun. Moreover, Nancy testified that she saw only one person with a gun, and that person was the shooter.

We next review the record regarding how the State and Appellant addressed the law of parties during voir dire and during the trial. During voir dire, the State went over the law of parties using the classic bank robbery example to show how everyone who

27

was involved—including the person who drove and the person who went into the bank with the shooter but did not exhibit a gun—would be guilty. The defense responded in its portion of voir dire as follows:

> [DEFENSE COUNSEL:] . . . [L]ike the prosecutor was explaining earlier. It's the classic law school example, the bank robbery example. Okay?
>
> And we could all be guilty under the law of parties, but if I just happen to know you and we're friends and I wasn't part of it at all, am I guilty?
>
> VENIREPERSON: No.
>
> [DEFENSE COUNSEL]: Why not? . . . .
>
> VENIREPERSON: Because you didn't -- you weren't there. You weren't involved.
>
> [DEFENSE COUNSEL]: I didn't do anything. Right? But I know all those people. I may have been friends with them. Right?
>
> VENIREPERSON: Uh-huh.

The State in its opening statement told the jury that

> [Appellant], that man over there, came up behind Nancy Howard on a Saturday, August 18th of 2012, in her garage in Carrollton, came up behind her, put his arm around her neck, and put a gun to her head, demanded her purse. As she spun around, handed him her purse and her Taco Bueno bag that she had just gone through the drive-through, he shot her point-blank in the left temple.
>
> The bullet traveled through her skull, down her throat, and lodged in her left shoulder -- excuse me, her right shoulder, where it stands still today.
>
> They were complete strangers. This was a murder-for-hire plot, and [Appellant] was the ultimate hitman.

28

During closing arguments, the State argued,

Ladies and gentlemen of the jury, on August 18th of 2012 in Grand Saline, Texas, [Appellant] and Michael Speck got into a rented silver Nissan Altima and left out on a mission that day, and that mission was to kill Nancy Howard.

. . . .

And as she pulled out of the parking lot having attended a [church] service[ and] stopped at the Taco Bueno, there were two individuals who were following her: Michael Speck and Michael Lorence. And as Nancy made her way home and Michael Speck dropped off Michael Lorence in that alleyway, there was one individual with a gun: Michael Lorence. And there was one who approached Nancy, acted like it was a robbery, and ended up shooting her in the face, almost killing her, taking her purse, dumping it in a nearby oil cannister dumpster, and then ultimately making their way back to Grand Saline, getting rid of the clothes and getting rid of the gun on the way back.

. . . .

This is the law in front of you: Then and there intentionally or knowingly caused bodily injury to Nancy Howard by shooting Nancy Howard with a firearm and during the commission of said assault used or exhibited a deadly weapon, a firearm. *Nothing about money exchanging hands, nothing about meetings taking place.* It's simply whether or not the offense of aggravated assault with a deadly weapon was committed.

And ultimately you have two options. The first being the charge as indicted. And then we talked a lot about what we call the law of parties, and we talked about that in voir dire. The common example used was the bank robbery. If you and I are going to rob a bank, it doesn't matter if I'm the driver and you go in there and get the money and rob the bank. It doesn't matter if I'm the lookout. It doesn't matter if I go in there and get the money. As long as we're working as a team aiding each other, then we are both equally responsible for robbing that bank regardless of our role. And that's -- we talked about the law of parties, and that's what you see in the second paragraph. We talk about aiding or attempting to aid Michael Speck.

29

And so what you ultimately have are what we call two charging paragraphs. It's kind of an "or" scenario. Did [Appellant] shoot Nancy Howard, or did he aid or attempt to aid or direct or encourage Michael Speck in the shooting of Nancy Howard? And that's why you see those two paragraphs in there for you to consider.

So we heard from a lot of different people in this case, and it was quite the cast of characters. We'll admit that. We don't have saints for witnesses. But when you want to dance with the devil, you've got to deal with the demons first, and that's the individuals who come before you in cases like this when we're talking about a big deal going on, when we're talking about ultimately shooting someone for potential money being involved.

But at the end of the day, there's only two, and it's the final two people who carried out this job, and that is Michael Speck and Michael Lorence. [Emphasis added.]

The defense's closing argument offered a theory of another shooter by emphasizing that Dustin, Speck's cousin, considered Billie, the person originally hired to be the shooter, a father figure and had agreed that he (Dustin) wanted to make Billie proud by taking over his role in the scheme. Defense counsel said, "And if you're sitting there at the end of this thinking, I wonder if it was Dustin? You are done, folks." The defense also pointed to Speck as the possible shooter: "And Billie Johnson, his patriarch uncle, was the one who learned that -- who was orchestrating, puppeteering this whole thing, learned Speck had done the shooting." Right before defense counsel ended her closing argument, she stated,

And so think about it, follow the law, and -- a note on the parties thing. That only comes from Michael Speck. And they have never suggested that he was anything other than the shooter, P.S. There is no evidence of helping Michael Speck plan anything. Okay? So just consider that. And then even if there were from Michael Speck, you have to have independent

30

corroboration of it, you know, in the law, and there's not. There's zero because that did not happen.

The parties' passing references to the law of parties and the vague references to Appellant's involvement in planning the shooting do not trump the charge in this case.

Based on the record and the jury's finding pursuant to the charge's principal paragraph—that Appellant was not the shooter—we hold that the jury necessarily decided that Appellant did not use or exhibit a firearm during the offense. And because of the unique structure of the charging paragraphs, the jury's finding that Appellant was not the shooter forced it to find that Appellant was not liable as a party even if he otherwise promoted or assisted in the plan to shoot Nancy. Under the conjunctive language in the law-of-parties charge, the jury was required to render a "not guilty" verdict if the State failed to prove just one of the three parts of the law-of-parties charge. *See State v. Sauceda*, Nos. 14-96-00287-CR, 14-96-00288-CR, 1999 WL 1041499, at *3 (Tex. App.—Houston [14th Dist.] Nov. 18, 1999, pet. ref'd) (op. on remand, not designated for publication) ("Under this charge, because all three factors were stated conjunctively rather than disjunctively, the State had to prove all three in order to secure a guilty verdict. Therefore, the jury could have returned a not[-]guilty verdict if *any* of those three factors was not proved[.]" (footnote omitted)). Thus, we cannot say that the jury necessarily made either of the first two findings under the law-of-parties charge just because we know that the jury necessarily made the third finding—which incorporated the deadly-weapon portion from the paragraph charging Appellant as the

31

shooter—and thus the necessarily made finding is precluding the jury from finding Appellant guilty as a party.

Appellant tries to deflect attention away from the significance of the charge's language, but in the end, that effort is unavailing. Throughout Appellant's brief, he complains about the law-of-parties charge, which was submitted by the State over his objection. He argues that the law-of-parties charge "vastly expand[ed] the conduct for which [he] could be found guilty such that [he] could be found guilty if he had *any* role, however[] insignificant, in the planned attack on [Nancy]." Appellant correctly points out that "[t]he jury charge is *one* component to a complete analysis in this case" and spends several pages of his brief setting forth some of the State's references to a plan, a scheme, or a plot, contending that "such references were a constant refrain from the State throughout trial." Despite the fact that the State referenced Appellant's involvement in the murder-for-hire scheme during the aggravated assault trial,[11] we must determine whether the State is collaterally estopped from prosecuting the conspiracy offense based on what issues the jury *necessarily* decided, not on whether the issue of Appellant's involvement in the murder-for-hire scheme was emphasized during the aggravated assault trial. *See Ex parte McNeil*, 223 S.W.3d 26, 30 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Watkins*, 73 S.W.3d at 268–69). As explained

---

[11]The State concedes in its brief, "It is true that the State did not hide from the jury the fact that there was a conspiracy to kill Nancy Howard."

32

above, the only issues that the jury necessarily decided were that Appellant was not the shooter and that Appellant did not use or exhibit a firearm during the offense.

Appellant further argues that because he was acquitted "of the object of the conspiracy – aggravated assault with a deadly weapon – both as the primary actor[] and as a party," the State is collaterally estopped from trying him for conspiracy. Appellant cites a conspiracy case that correctly sets forth the law but deals with a different factual scenario than the one presented here. Appellant relies on *Acuña v. State*, in which Acuña was acquitted of murder following a trial in which a parties charge was submitted. No. 13-13-00633-CR, 2016 WL 744712, at *1, *6 (Tex. App.—Corpus Christi–Edinburg Feb. 25, 2016, no pet.) (mem. op., not designated for publication). The State then tried Acuña for conspiring to commit the same murder, and a jury found her guilty of conspiracy. *Id.* at *1, *6–7. The court of appeals reversed, holding that "[i]n this case, there is no perceptible difference between, on the one hand, performing an act 'with intent to promote or assist' [the victim's] murder, and on the other hand, performing the same act 'in pursuance of' an agreement to commit the same murder" and that "the 2011 jury [in the murder trial] already necessarily decided the issue of whether Acuña performed one of the specified acts 'in pursuance of' an agreement to murder [the victim]—an essential element of the conspiracy offense." *Id.* at *10. *Acuña* is distinguishable because here, although Appellant was acquitted as the shooter, it cannot be said that the jury necessarily decided that he had no role as a party in helping plan

33

the shooting; the conjunctive law-of-parties charge relieved the jury of necessarily deciding that issue.

Accordingly, based on what the jury was required to decide in the principal charging paragraph and the law-of-parties charge, as well as the evidence and arguments presented at trial, the jury necessarily decided only that Appellant was not the shooter and did not use or exhibit a firearm during the offense.

### 2. Whether the necessarily decided issues constitute essential elements of conspiracy

We now move to the second step of the *Ashe* collateral-estoppel analysis and determine whether the necessarily decided issues constitute essential elements of the conspiracy offense. Based on the analysis that follows, we conclude that the necessarily decided issues—that Appellant was not the shooter and that he did not use or exhibit a firearm—are not essential elements of Appellant's conspiracy charge.

The indictment in the conspiracy case states as follows:

THE GRAND JURORS, in and for the County of Denton, State of Texas, duly organized, impaneled, and sworn as such, at the January Term, A.D., 2013, of the District Court of the 158th Judicial District in and for said county and state, upon their oaths, present in and to said Court that MICHAEL LORENCE, who is hereinafter styled defendant, pursuant to one scheme or continuing course of conduct that began on or about the 15th day of February[] 2010, and continued until on or about the 18th day of August[] 2012, and anterior to the presentment of this Indictment, in the county and state aforesaid, did then and there, with intent that Capital Murder, a felony, be committed, agree with Stacey Serenko, Dustin Hiroms, Stephanie Delacerda, Anthony Rendine, Ryan Rogers, Michael Speck, Billie Johnson[,] and John Howard that they or one of them would engage in conduct that would constitute said offense, to-wit: cause the death of Nancy Howard in exchange for money, and Stacey Serenko,

34

Dustin Hiroms, Stephanie Delacerda, Anthony Rendine, Ryan Rogers, Michael Speck, Billie Johnson[,] and John Howard performed an overt act in pursuance of said agreement, to-wit: embezzled money to pay to have Nancy Howard murdered, had phone conversations regarding the conspiracy to commit the Capital Murder of Nancy Howard, received and sent texts regarding the conspiracy to commit Capital Murder of Nancy Howard, procured photos of Nancy Howard, paid to have Nancy Howard murdered, accepted payment for murdering Nancy Howard, met with one or more of the co-conspirators, drove by Nancy Howard's house, followed Nancy Howard, performed surveillance on Nancy Howard, took photos of Nancy Howard's house, and shot Nancy Howard with a firearm[.]

The essential elements of conspiracy in this case include an intent that capital murder be committed, an agreement with the named individuals that one of them would engage in conduct that would cause Nancy's death in exchange for money, and the named individuals acted in furtherance of that agreement by performing various tasks leading up to and including shooting Nancy.

As set forth in the preceding analysis, the issues necessarily decided by the jury in the aggravated assault trial were whether Appellant was the shooter and whether he used or exhibited a firearm, and the jury found by its verdict that Appellant was not the shooter and that he did not use or exhibit a firearm. *See Ashe*, 397 U.S. at 445, 90 S. Ct. at 1195; *Murphy*, 239 S.W.3d at 795. The State is therefore collaterally estopped from relitigating those issues. *See McNeil*, 223 S.W.3d at 31 (citing *Watkins*, 73 S.W.3d at 269). However, collateral estoppel does not bar the State from prosecuting Appellant for a conspiracy relating to Nancy's shooting.

Here, by finding Appellant not guilty of aggravated assault with a deadly weapon, the jury necessarily found only that Appellant did not shoot Nancy or use or exhibit a firearm; these are not essential elements of the conspiracy charge in this case. Furthermore, contrasting the allegations in the conspiracy indictment with the aggravated assault indictment[12] and the jury charge in the aggravated assault prosecution, it is apparent that the issues are not identical. Due to the conjunctive nature of the law-of-parties charge in the aggravated assault trial, a rational jury could have grounded its verdict solely on the issue of whether Appellant used or exhibited a firearm during the offense without addressing whether Appellant helped plan the shooting. Thus, the issues that the jury necessarily decided in the aggravated assault trial are not essential elements of the offense of conspiracy as charged in Appellant's indictment. *See id.* at 32.

---

[12]The indictment in the aggravated assault case is as follows:

THE GRAND JURORS, in and for the County of Denton, State of Texas, duly organized, impaneled, and sworn as such, at the July Term, A.D., 2014, of the District Court of the 362nd Judicial District in and for said county and state, upon their oaths, present in and to said Court that MICHAEL LORENCE, who is hereinafter styled defendant, on or about the 18th day of August[] 2012 and anterior to the presentment of this Indictment, in the county and state aforesaid, did then and there intentionally or knowingly cause bodily injury to [Nancy] by shooting [Nancy] with a firearm, and the defendant did then and there, during the commission of said assault, use or exhibit a deadly weapon, to-wit: a firearm[.]

### 3.     Disposition of Appellant's Appeal

Because Appellant did not meet his burden of showing that the jury in the aggravated assault trial necessarily decided that he did not help plan Nancy's shooting, collateral estoppel does not preclude his prosecution for conspiracy. *See Adams*, 586 S.W.3d at 8; *Sauceda*, 1999 WL 1041499, at *4. Accordingly, we hold that the trial court did not abuse its discretion by denying Appellant's pretrial application for writ of habeas corpus seeking relief from double jeopardy based on collateral estoppel, and we overrule Appellant's sole issue.

## V.  The State's Appeal[13]

In its sole issue, the State argues in its cross-appeal that because the only issue the jury decided against the State dealt with the identity of the shooter, the trial court abused its discretion when it suppressed evidence that went beyond that issue.

---

[13]At the outset of the State's appeal we note that Article 44.01 of the Texas Code of Criminal Procedure allows the State to appeal certain matters. *See generally* Tex. Code Crim. Proc. Ann. art. 44.01(a)(5). In construing this statute, the Texas Court of Criminal Appeals has held that Article 44.01 is not limited solely to pretrial rulings that suppress "illegally obtained" evidence. *State v. Medrano*, 67 S.W.3d 892, 903 (Tex. Crim. App. 2002). Article 44.01(a)(5) permits the State to "appeal an adverse ruling on *any* pretrial motion to suppress evidence as long as the other requirements of the statute are met," including a motion to exclude. *Id.* Here, the State's prosecuting attorney has met the remaining requirements of the statute by certifying to the trial court that jeopardy has not attached, the appeal is not taken for the purpose of delay, and the evidence suppressed by the trial court is of substantial importance in this case. *See* Tex. Code Crim. Proc. Ann. art. 44.01(a)(5).

## A.     The Evidentiary Exclusions

As mentioned above, although the trial court denied Appellant's pretrial application for writ of habeas corpus, the trial court granted many of Appellant's requests for evidence to be excluded from the conspiracy trial. Specifically, the trial court excluded "all of the items [that] the State and [Appellant] agreed on, as listed in the State's Response to Defense Proposed Exclusions, pages two through fifteen, in addition to the following:" all photo lineups; all photos of Appellant, with the exceptions he requested; the agreed portions of the 911 call (State's Exhibit 56); the agreed portions of Appellant's interview (State's Exhibit 299); Misti's second statement (State's Exhibit 328); and seven other items from the 2019 trial. The trial court also excluded "all of the items [that] the State and Appellant agreed on, as listed in the State's Response to Defense Proposed Exclusions From 2015 Trial, pages two through eleven," in addition to twenty-two listed items. The trial judge explained his rationale for excluding various evidence when he stated at the hearing that "if anything [was] pointing to [Appellant] as the shooter, then that's excluded" because it would "violate collateral estoppel or double jeopardy with regard to going further on a conspiracy case." On appeal, the State challenges only the following evidentiary exclusions, which are from the 2019 trial unless otherwise specified:

- Misti's testimony about why Speck and Appellant left town, that they reserved a room, and that they returned that night;

38

- Investigator Wall's testimony that there appeared to be two people in the car based on surveillance footage;

- All of Vollintine's testimony;

- Investigator Wall's testimony about whether he had found any evidence relating to a Facebook conversation, text message, or communication about "a job six feet under, nails in a coffin, or anything like that";

- Kayla's testimony from the 2015 trial that Appellant knew what the job was, that he was good with the job, and that he had a gun prior to the shooting;

- Speck's testimony from the 2015 trial that it was down to him and Appellant to finish the job, that he and Appellant had spoken on the phone about a murder-for-hire job in Texas, that he had shown Appellant a picture of Nancy and her car, that the purpose of renting the car was to drive to do the shooting, that they went to Ross to buy clothes and about what they had bought, about a specific time when he was supposed to see Nancy, about following Nancy to church, about whether he or Appellant had gloves, and about whether he or Appellant had the gun; and

- Investigator Wall's testimony from the 2015 trial that there was a passenger in the car and about trying to enhance the surveillance video.

The State agrees that evidence of Appellant as the shooter cannot be admitted in the conspiracy trial but contends that the above testimony does not identify Appellant as the shooter.

## B. Standard of Review

Like any ruling on the admission of evidence, a trial court's ruling on a motion to suppress[14] is reviewed for an abuse of discretion. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009); *see also Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (applying abuse-of-discretion standard when reviewing the trial court's decision to exclude evidence). Therefore, we must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Amador*, 275 S.W.3d at 878–79; *see also Hereford v. State*, 339 S.W.3d 111, 117–18 (Tex. Crim. App. 2011); *Stevens*, 235 S.W.3d at 740; *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

---

[14]As explained in *Medrano*, there is no difference between a "motion to suppress" and a "motion to exclude":

> Texas law concerning pretrial motions . . . under article 28.01, § 1(6)[] do[es] not distinguish between a "motion to suppress evidence" and a "motion to exclude evidence." There was no reason for the Texas legislature to include "motion to exclude" in article 44.01 because it is not found in article 28.01, either. There is no such statutory term in Texas law as a pretrial "motion to exclude," either for the defendant to file or for the State to appeal.

67 S.W.3d at 901. We therefore treat Appellant's proposed exclusions, which were developed in response to the trial court's request at the conclusion of the writ hearing, as a motion to suppress evidence from the conspiracy trial.

We defer almost totally to the trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

In other words, we view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 818.

### C. Analysis

The State contends that "[b]ecause none of the [challenged] testimony specifically identified [Appellant] as the shooter, collateral estoppel did not require its suppression[.]" The State relies on a Fifth Circuit case and a case from the Houston First District Court of Appeals in support of its argument. But holdings of the Fifth Circuit are not binding on the Texas Court of Criminal Appeals or on this court, *see Stewart v. State*, 686 S.W.2d 118, 121 (Tex. Crim. App. 1984); *Villarreal v. State*, 267 S.W.3d 204, 208 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) ("Fifth Circuit precedent is not binding on Texas courts[.]"), and neither are decisions of our sister courts. *See Landaverde v. State*, Nos. 05-19-00175-CR, 05-19-00176-CR, 2020 WL

2897108, at *10 (Tex. App.—Dallas June 3, 2020, pet. filed) (mem. op., not designated for publication); *Delamora v. State*, 128 S.W.3d 344, 359 (Tex. App.—Austin 2004, pet. ref'd). Additionally, neither the Fifth Circuit case nor the case from the First Court of Appeals analyzes the admissibility of specific pieces of witnesses' testimony. In *U.S. v. Brackett*, the Fifth Circuit reversed the district court, which had concluded that *all evidence* introduced in the possession of the prosecution must be suppressed in the conspiracy trial. 113 F.3d 1396, 1400, 1402 (5th Cir. 1997). In *McNeil v. State*, an appeal from McNeil's arson conviction, the First Court of Appeals reviewed the admissibility of evidence—that a child was found dead in the house—in the arson trial after McNeil's earlier acquittal of capital murder; *McNeil* is thus not in the same procedural posture, as the First Court was not making a pretrial determination on evidence that should be suppressed in a later trial on a different offense. 398 S.W.3d 747, 755–56 (Tex. App.— Houston [1st Dist.] 2011, pet. ref'd). Both *Brackett* and *McNeil* are therefore distinguishable.

> As noted by Appellant,
>
> it is important to recognize that there are *no appellate opinions* identified by the State nor known to [defense] counsel that do what the State requests this [c]ourt of [a]ppeals to do in its cross-appeal: sit as if it were the trial court and make pretrial rulings about the admissibility of a plethora of evidentiary issues prior to trial. Indeed, that is exactly what the standard of abuse of discretion prohibits an appellate court from doing.

Instead, viewing the evidence in the light most favorable to the trial court's ruling, as we are required to do, we cannot say that the trial court—who sat through both the

42

2015 trial and the 2019 trial, saw the witnesses, and heard all of the testimony—abused its discretion by excluding the challenged evidence that the State seeks to admit during the conspiracy trial. The trial court was in the best position to judge the credibility and the demeanor of the witnesses and to determine whether the challenged evidence points to Appellant as the shooter and thus must be excluded from the conspiracy trial. We therefore decline the State's invitation to reevaluate the witnesses' credibility. *See Thomas v. State*, No. 09-16-00232-CR, 2018 WL 915194, at *4 (Tex. App.—Beaumont Feb. 14, 2018, no pet.) (mem. op., not designated for publication) (stating that in a bench trial, the trial judge is the sole judge of the credibility of the witnesses and that we do not reevaluate the weight and credibility of the evidence produced at trial or substitute our judgment for that of the factfinder) (citing *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. [Panel Op.] 1978), and *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)).

Based on the abuse-of-discretion standard of review that we are required to apply,[15] we hold that the trial court did not abuse its discretion by ruling that the challenged testimony should be excluded from the conspiracy trial. Accordingly, we overrule the State's sole issue.

---

[15]Both the State and Appellant agree that this is the standard that applies here.

## VI.  Conclusion

Having overruled Appellant's sole issue, we affirm the portion of the trial court's order denying relief on Appellant's pretrial application for writ of habeas corpus seeking to be free from double jeopardy based on collateral estoppel.  Having overruled the State's sole issue in its cross-appeal, we affirm the remainder of the trial court's order that includes the challenged evidentiary exclusions.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 3, 2020

44